## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JEANMARIE BOOKER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-2488** |
| **JOHNNIE JONES, WARDEN** | **SECTION "N" (6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2).  Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

# I.  PROCEDURAL HISTORY[1]

On January 18, 1996, petitioner was charged in a grand jury indictment with first degree murder.  On January 22, 1996, through ad hoc counsel, petitioner entered a plea of not guilty.  On January 23, 1996, trial counsel filed a motion to recuse the judge in Section G, which motion was granted.  On January 26, 1996, at her rearraignment in Section E, petitioner pled not guilty and not guilty by reason of insanity.  At a lunacy hearing on February 27, 1996, petitioner was found incompetent to proceed to trial.  On March 4, 1997, following a lunacy hearing at which the parties stipulated to the treating physician's testimony, petitioner was found competent to proceed to trial.

From May 11 to May 14, 1998, petitioner was tried by a jury that found her guilty of second degree murder.  On July 31, 1998, the trial court denied petitioner's motion for a new trial and sentenced her to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.

On August 2, 2000, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence.  *State v. Booker*, No. 99-KA-1962 (La. App. 4 Cir. 2000) (unpublished opinion).[2]  On June 29, 2001, the Louisiana Supreme Court denied

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit Court of Appeal's unpublished opinion, *State v. Booker,* No. 99-KA-1962 (La. App. 4 Cir. 2000), a copy of which is contained in the State rec., vol. 2 of 3.

[2]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 2 of 3.

petitioner's writ application, thereby rendering her conviction and sentence final.  *State v. Booker*, 794 So.2d 823 (La. 2001).

Following the conclusion of her direct appeal proceeding, petitioner sought post-conviction relief.  Petitioner's efforts in this regard culminated on April 22, 2005, when the Louisiana Supreme Court denied her writ application.  *State ex rel. Booker v. State*, 899 So.2d 560 (La. 2005).

On June 15, 2005, petitioner filed the instant petition for writ of habeas corpus.[3]  The State, in its response, concedes that the instant action is timely and does not contest that petitioner has exhausted her state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).[4]  Accordingly, this court shall review the pertinent facts, then proceed to address the merits of petitioner's claims.

---

[3]This June 15, 2005 filing date was ascertained via the court's use of the "mailbox rule." Under this rule, a pleading filed by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court. *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Generally, the date a prisoner signs his or her petition, in this case, October 22, 2004, is presumed to be the date he or she delivered it to prison officials for mailing. *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999) (assumed that petitioner turned his habeas corpus application over to prison officials for delivery to this court on the date he signed his application); *Magee v. Cain*, 2000 WL 1023423, *4 n.2 (E.D. La. 2000) (inferred that filing date and signature date of habeas petition were the same); *Punch v. State*, 1999 WL 562729, *2 n.3 (E.D. La. 1999) (may reasonably be inferred that prisoner delivered habeas petition to prison officials for mailing on date he signed petition).

[4]*See* Federal rec., doc. 28, p. 4.

**II.  FACTS**[5]

On Thanksgiving Day 1995, Cynthia Cook and James Mitchell, Cook's boyfriend of five years, had a family dinner at Cook's home in New Orleans East.  Cynthia's daughter, Rechelle, Rechelle's boyfriend, Marvin Gillespie, and Rechelle's daughter, Reanne, also lived with them.  After other relatives left between midnight and 1:00 a.m., Cook and Mitchell got ready for bed.  As they were getting into bed, the doorbell rang.  It was the defendant, Jeanmarie Booker.  Mitchell put on his pants and answered the door.  Booker asked to speak to Cynthia.  Mitchell had never seen Booker before, and did not know who she was.  He told her that Cynthia was sleeping.  At that time, Rechelle came to the door.  She recognized Booker, her godmother and an old friend of the family, and hugged and kissed her.  Mitchell walked back to his bedroom.  Booker told Rechelle that she would come back and see Cynthia another time and walked away.  Cynthia, in the meantime, put on her nightshirt and went to the front room.  Rechelle called out to Booker to come back, then went back to her own bedroom.

After Cynthia left her bedroom, Mitchell heard the stranger's voice say, "Die you bitch," and "Where are the lights at in this mother fucker?"  He also heard a couple of pops, which sounded like faint firecrackers.  Mitchell ran back to the front of the house and

---

[5]The facts are taken from the state appellate court's opinion on direct appeal, *State v. Booker*, No. 99-KA-1962 (La. App. 4 Cir. 2000) (unpublished opinion).

found Cynthia lying in the foyer with a bullet wound.  Rechelle ran to her mother, Gillespie called 911, and Mitchell got the keys to his truck.  Mitchell and Gillespie then carried Cynthia to the truck and took her to Lakeland Hospital.  Meanwhile, Booker continued shooting outside, wounding both Rechelle and Gillespie as they tried to flee from her. Finally, Booker went back to her van, reloaded her gun, but told them she was not going to shoot anymore.

On the way to the hospital, Mitchell noticed that Gillespie was also bleeding. Gillespie remained at the hospital for treatment, but Mitchell went back to the house out of concern that Rechelle and Reanne had been left alone.  When he got there, he learned that Rechelle had also been shot and had already been taken to the hospital by ambulance. Despite objections by the officers on the scene, Mitchell went back to the hospital and learned that Cynthia was dead.

Eddie Booker, petitioner's husband, testified that on Thanksgiving Day he and his wife returned with their grandson to their home in Slidell between 11:00 p.m. and midnight after taking some relatives home.  Mr. Booker went directly upstairs and fell asleep in the TV room.  At some point, his wife woke him up.  She told him, "Get up.  You don't have to go now.  Cynthia's dead and I'm going to turn myself in."  He got up and got dressed.  Then Mr. Booker, his wife, and their grandson walked out of the house.  St. Tammany Parish deputies rushed them.

Mr. Booker testified that he had had a relationship with Cynthia Cook in 1994 and 1995.  He further testified that he and his wife had been to counseling about her drinking problem and their marital problems, including his infidelity.  He testified that his wife was badly injured in an accident immediately after discovering his affair with Cynthia Cook in September of 1994.  Mr. Booker and Ms. Cook stopped seeing each other after the accident, but resumed the affair some time in 1995.  Mr. Booker maintained that his wife knew that he intended to get an apartment and move out.  However, he did not recall telling her on Thanksgiving Day that it would be their last holiday together.  He did not recall that his wife drank any more than usual that day, or that she was crying.

Mr. Booker testified that his wife had access to his vehicles, including his green van, which was seen at the scene of the shooting.  He further testified that he owned several weapons, for hunting and for personal protection, which he kept in a closet.  He noticed that he had not seen his .38 caliber revolver in a while.

Dr. Paul McGarry did the autopsy on the body of Cynthia Cook.  He determined that she died of a massive hemorrhage from a gunshot wound.  The bullet entered near the center of her upper abdomen, went through her intestines, stomach, aorta and spine, and lodged in her back.  A .38 caliber bullet was retrieved from the victim's back.  Black powdery material around the entry hole indicated that the muzzle of the gun was within a few inches of the victim's body when the gun was fired.  Dr. McGarry further opined that death

from that wound was inevitable because the hole in the aorta was larger than the channel to the aorta, so blood poured out faster than the victim could be treated.

Because Rechelle Cook was able to identify Jeanmarie Booker as the perpetrator and knew her by name, the New Orleans Police Department (NOPD) advised the St. Tammany Sheriff's Office to go to Booker's residence in Slidell to determine if the green van used in the incident was there.  Early that morning, deputies went to that location and waited for further instructions from NOPD.  While waiting, Booker came out with her husband and grandchild.  They were all taken into custody.  Mr. Booker was interviewed and released.  NOPD officers picked up Jeanmarie Booker from the St. Tammany Parish jail and took her to New Orleans.  The transporting vehicle broke down twice on the way.  On both of those occasions, Booker attempted to escape.

The defense called Joel Booker, Jeanmarie Booker's son, who testified that he was in the kitchen with his mother preparing Thanksgiving dinner.  He testified that she was drinking heavily and crying a great deal.  Louise Breaux, Booker's longtime friend, testified that Booker called her in the early morning hours the day after Thanksgiving and woke her up to tell her that she had just shot Cynthia Cook and was turning herself in.

Dr. Carol Self, a clinical psychologist, testified that Booker was referred to her in May of 1995 for therapy due to panic attacks and alcohol abuse.  Booker was unable to function since recovering from her automobile accident in September of 1994.  Booker's

husband went to some sessions where marital issues, including his affair with the victim, were discussed.  Booker saw Dr. Self several times from May through July, but only a few times after that.  Dr. Self testified that Booker had decided not to delve into her deeper problems, and was concerned mainly with avoiding a return to work and assistance with the paperwork required for benefits.  Dr. Self admitted that she was not familiar with the legal standard for insanity.

Dr. Sarah Deland testified that she was appointed by the court to evaluate Booker's competence to proceed to trial.  Dr. Deland first evaluated Booker in February of 1996, at which time she found her suffering from major depression and anxiety and found her incompetent.  After treatment with medication, Dr. Deland and Dr. Richard Richoux, who was also appointed by the court, subsequently found Booker competent to proceed to trial.  In addition, they found that she was impaired from depression and alcohol abuse, but the level of impairment did not reach the level of being unable to know the difference between right and wrong.

Dr. Carlos Kronberger, another clinical psychologist, testified that he had done extensive work with patients suffering from dual disorders of an independently diagnosed medical disorder and chemical dependency.  He reviewed Booker's history and testified that Booker's behavior on the day of the shooting was not rational and that she was not in her "right mind."

8

On rebuttal, the State called Dr. Hermender Mallik, a forensic psychiatrist and staff doctor at the Feliciana Forensic Facility, where Booker was treated when she was determined to be incompetent to proceed to trial.  Dr. Mallik testified that he reviewed all the medical and incident reports on petitioner and that he evaluated her personally on several occasions.  He also interviewed family members and a co-worker.  He found Booker manipulative and uncooperative.  He opined that Booker knew the difference between right and wrong when she killed Cynthia Cook.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant
> the writ if the state court arrives at a conclusion opposite to that reached by

> this Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle from this
> Court's decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210

F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and we

will give deference to the state court's decision unless it `was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## IV.  ANALYSIS

### A.  Admission of Hearsay Testimony

One of the witnesses who offered testimony at petitioner's trial was Dr.

Hermender Mallik, an expert, testifying on behalf of the State, in the field of forensic

neuropsychiatry.[6]  Petitioner attributes the jury's verdict of guilty on the charge of second-

degree murder to the trial court's error in allowing Dr. Mallik to offer hearsay testimony

regarding his telephone interviews with Cheryl Dominick, the victim's sister, and Courtney

Bagneris, one of petitioner's former co-workers.  Specifically, Dr. Mallik testified:

Miss Dominick related one information, which is back in August of

---

[6]*See* State rec., vol. 2 of 3, trial transcript at p. 206.

1995, which is also corroborated by Miss Courtney Bagneris, where they - - this was them describing to me how their relationship was with their sister or their co-worker after she found out or Miss Booker found out about the relationship.  On one occasion Miss Booker had gone to Miss Cook's house one evening.  She was drunk.  And she confronted Miss Cook and told her, if you continue to see [my husband], I will kill you.[7]

According to petitioner, while "the case was not really close" on the issue of whether or not she was legally sane at the time she shot Cynthia Cook, the "case was close" "on the decision for the jury between murder and manslaughter based on 'sudden passion or heat of blood.'"[8]  Petitioner argues:

Through [the above] hearsay evidence, a juror otherwise inclined to return a verdict of manslaughter could well have been persuaded over time (the jury deliberations, after all, took 11 hours) that Booker harbored the intent to kill Cook from August to November 1995.  The threat, coming as it allegedly did just three months before Thanksgiving, was strong evidence that Booker was just waiting for the occasion to take revenge on Cook.  As a consequence of this hearsay evidence, the shooting on Thanksgiving lacked the spontaneity and circumstantial impetus to support a verdict of manslaughter based on sudden passion or hot blood that had not cooled.[9]

––––––––––––––––––––

[7]*See* State rec., vol. 2 of 3, trial transcript at p. 218.

[8]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 11.  Under LSA-R.S.14:30.1, second degree murder is defined, in pertinent part, as "the killing of a human being ... [w]hen the offender has a specific intent to kill or inflict great bodily harm".  Under LSA-R.S. 14:31, manslaughter is defined, in pertinent part, as "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control or cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed ".

[9]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 19-20.

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding. *Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 260-61, 19 L.Ed.2d 319 (1967). As long as the evidentiary ruling is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted. *Id. See also Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994).

In examining the pertinent issue on direct appeal, the Louisiana Fourth Circuit Court of Appeal recognized the trial court's error in allowing the hearsay evidence without any admonishment to the jury. La.C.Cr.P. art. 771 provides for an admonishment to the jury to disregard a remark or comment made during trial when the remark is "of such a nature that it might create prejudice against the defendant ... in the mind of the jury". However, the court further recognized that a violation of Article 771 may be considered "harmless" in light of overwhelming evidence supporting the jury's verdict, and that "[t]he standard in considering evidence under the harmless error analysis is 'whether the guilty verdict actually rendered is *surely unattributable* to the error.' *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)." *Booker*, No. 99-KA-1962 at p. 15 (emphasis original).

In this case, there were several indications that petitioner's shooting of the victim was premeditated rather than action taken "in sudden passion" or "heat of blood." As

the state appellate court noted:

> [Petitioner] did not park in the driveway of Ms. Cook's house, but rather parked three houses down.  She shot the victim, then shot two witnesses.  She discarded the gun.  She then returned home, woke her husband, and told him that she killed Ms. Cook and was going to turn herself in.

*Booker*, No. 99-KA-1962 at p. 9.  Further, petitioner, with a gun in her possession, drove from Slidell to the victim's home in New Orleans East, specifically "asked for the victim, pointed the gun at the victim, stated 'Die, Bitch', and then fired two shots at her."  *Id*. Additionally, petitioner's contention that she was drunk at the time of the shooting was belied by the testimony of witnesses who came in contact with her.  Rechelle Cook, the victim's daughter, who petitioner kissed shortly before the shooting, testified that she "did not smell alcohol on [petitioner's] breath."  *Id*.  Similarly, St. Tammany Parish Sheriff Deputy Wharton Muller, who detained petitioner shortly after the shooting, testified that he was in "[v]ery close proximity" with petitioner and he did not recall smelling any alcohol on her breath.[10]

Based on the above, the state appellate court concluded that "[t]he verdict rendered in this case was surely unattributable to Dr. Mallik's reference to the threat made by [petitioner] three months prior to the killing."  *Id.* at 15-16.  The Fourth Circuit's ruling in this regard is in accordance with applicable state law and impinges no guarantee provided under the Constitution.  As such, petitioner's claim for habeas corpus relief is without merit.

---

[10] *See* State rec., vol. 2 of 3, trial transcript at p.86.

## B. Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner argues that counsel was unconstitutionally ineffective because: 1) He stipulated to the testimony of Dr. Sarah Deland at a March 4, 1997 competency hearing; 2) he stipulated to the trial testimony of Officer Carl Palmer; 3) he waived petitioner's appearance at a pre-trial suppression hearing and pre-trial competency hearing;

14

4) he did not properly investigate the facts of petitioner's case and did not interview material witnesses prior to trial; 5) he did not go with petitioner to the scene of the shooting; and, 6) he did not properly review physical evidence with petitioner prior to trial.[11]  However, as the State points out in its response, petitioner has failed to set forth how she was prejudiced by these allegedly deficient actions on the part of counsel.

With respect to counsel's stipulations, petitioner fails to specify how full cross-examination of these witnesses would have significantly changed their testimony to benefit the defense.  Nor does petitioner assert how her presence at the pre-trial hearings would have favorably impacted said hearings.[12]  As for counsel's failure to investigate facts, interview witnesses, visit the scene, and review physical evidence, petitioner merely lists these alleged deficiencies, providing no specifics as to how she was prejudiced by the deficiencies.  As the State notes, petitioner's "failure to assert and prove actual prejudice" resulting from the above deficiencies, "is fatal" to her ineffectiveness claim.[13]

Petitioner complains that counsel was ineffective due to his failure to object to testimony offered by James Mitchell, Eddie Booker and Dr. Hermender Mallik.  Again,

---

[11]*See* Federal rec., doc. 1, petitioner's  supporting memorandum at pp. 30-31.

[12]In connection with her direct appeal, petitioner claimed that the trial court erred in allowing the pre-trial motions to proceed in her absence.  In addressing this claim, the state appellate court made clear that the trial court's ruling in this regard was not violative of state law.  *See State v. Booker*, 99-KA-1962 at pp. 10-13.

[13]*See* Federal rec., doc. 28, State's response at pp. 10-11.

however, petitioner has failed to make the requisite prejudice showing.

With respect to James Mitchell, petitioner contends that "counsel failed to object to the reading of a hearsay statement".[14]  Though petitioner does not specify, the court assumes the "hearsay statement" to which petitioner is referring is Mitchell's statement that just before the shooting he heard petitioner say, "die, you bitch.  Where are the lights at in this mother fucker."[15]  However, counsel had no viable basis to object to the above statement by James Mitchell since under Louisiana law said statement would not be considered to be inadmissible hearsay.  Specifically, Louisiana Code of Evidence Article 804(B)(3) provides, in pertinent part:

> **B.  Hearsay exceptions**.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> **(3) Statement against interest**.  A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

With respect to Eddie Booker, petitioner complains that counsel failed to object, based upon spousal privilege, to Eddie Booker's testimony regarding statements petitioner made to him "immediately following" the shooting.[16]  The testimony to which

---

[14]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 32.

[15]*See* State rec., vol. 2 of 3, trial transcript at p. 32 and p. 47.

[16]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 32.

petitioner is referring is Eddie Booker's testimony that on the day after Thanksgiving, 1995, at approximately one o'clock in the morning, petitioner woke him up and said: "[G]et up. Cynthia's dead.   You don't have to go.   I'm going to go turn myself in."[17]   Petitioner, however, was not unduly prejudiced by the above remark given the ample evidence that petitioner specifically intended to shoot the victim.   As noted above, in addition to the above testimony from Booker, the evidence reflected that petitioner, armed with a gun, drove from her home in Slidell to the victim's home in New Orleans East.   Further, when she arrived at the victim's house, she did not park in front, but rather, parked "three houses down", then specifically asked to see the victim, shot the victim and continued shooting, wounding the victim's daughter and her boyfriend.[18]

Finally, in connection with Dr. Mallik, petitioner again complains about the hearsay statements he related to jurors regarding his telephone interviews with Cheryl Dominick and Courtney Bagneris.   However, as set forth earlier,[19] given the significant other evidence reflecting petitioner's intent, the error in allowing this evidence was "harmless" and petitioner, therefore, cannot make the prejudice showing required under *Strickland*.

Petitioner next complains about counsel's failure to object to the introduction

---

[17]*See* State rec., vol. 2 of 3, trial transcript at p. 93.

[18]*See* discussion *supra* at p. 13.

[19]*See* discussion *supra* at pp. 12-13.

of photographs of the victim, along with the introduction of the clothing she was wearing, based upon the gruesomeness and inflammatory nature of this evidence.  Further, petitioner contends that counsel should not have stipulated to the expert fingerprint and ballistic testimony offered by Officer Suezeneau and Officer Windbush, respectively.  However, again, petitioner provides no specifics as to how she was unduly prejudiced by this evidence. As petitioner concedes, "there was never a question that it was Booker who shot Cook."[20] Thus, there would be little to gain from challenging the testimony of the fingerprint and ballistics experts.  Further, explicit photographs depicting the scene may have provided credence to petitioner's theory that the crime was one of passion rather than specific intent.

Next, petitioner complains that "counsel was deficient by not introducing records of [her] past psychiatric hospitalization."[21]   However, the facts pertaining to petitioner's prior hospitalizations were brought out through the testimony of Dr. Deland and Dr. Kronberger.  In particular, Dr. Kronberger offered detailed testimony regarding his review of petitioner's medical records which reflected that petitioner had twice been hospitalized for the treatment of depression.  He informed jurors that in 1980, petitioner was hospitalized at Southwest Memorial Hospital for a period of four weeks and was "classified" as suffering from  "depressive neurosis, which is a mild type of depression."  He further

---

[20]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 11.

[21]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 33.

informed that petitioner's four-week hospitalization was followed by five years of "intensive individual and group therapy".  Two years later, petitioner was again hospitalized and was again diagnosed with "mild depression."  In connection with this second hospitalization, however, Dr. Kronberger observed, from his examination of petitioner's records, that petitioner was "started on anti-depressant medication, which she took for some time".[22] Similarly, Dr. Deland testified that petitioner "had a history of psychiatric hospitalizations, going back to 1980 and had been in and out of treatment for depression and anxiety".  Dr. Deland further informed that petitioner had "a history of one or two suicide attempts".[23]

Clearly, jurors, via the expert testimony of Dr. Kronberger and, to a lesser extent, Dr. Deland, were apprised of petitioner's past psychiatric problems.  Given petitioner's failure to elaborate what additional information would have been gleaned from the hospital records and how she was prejudiced due to the absence of such information, the court finds that petitioner is not entitled to habeas relief on this issue.

Petitioner next argues that counsel was ineffective in failing, in response to Dr. Mallik's hearsay testimony, to move for a mistrial in front of the jury and in failing to request a jury charge to the effect that jurors should "disregard evidence of other crimes and bad

---

[22]*See* State rec., vol. 2 of 3, trial transcript at pp. 180-181.

[23]*See* State rec., vol. 2 of 3, trial transcript at pp. 154 and 155.

character evidence".[24]  A review of the trial transcript reflects that defense counsel, in front

of the jury, objected to Dr. Mallik's hearsay testimony and the trial judge "sustain[ed] the

objection."[25]  That counsel moved for a mistrial in chambers, rather than in front of the jury,

resulted in no prejudice to petitioner since the court denied the motion for mistrial.  In fact,

one of the reasons the discussion, which led to the motion for a mistrial, was conducted

outside the presence of the jury, was because the trial court went to great lengths to explain

to the witness why he had sustained defense counsel's objection and why the witness could

not continue with this line of testimony.[26]  As for counsel's alleged ineffectiveness based

upon his failure to ask for a jury instruction regarding prior bad acts, once again, petitioner

had failed to make the requisite prejudice showing.  As a result of defense counsel's

objection, which the trial court sustained, any damage caused by Mallik's brief reference to

hearsay statements was minimal and did not prejudice petitioner.

### C.    Trial Court Erred With Respect to Partial Reading of Jury Instructions in Response to Jury's Inquiries; Counsel was Ineffective in Failing to Object to Partial Reading

An examination of the trial transcript reflects that jurors wrote a question,

"what is specific intent".  In response, the trial court reread to jurors his instruction regarding

---

[24]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 34.

[25]*See* State rec., vol. 2 of 3, trial transcript at pp. 218-219.

[26]*See* State rec., vol. 2 of 3, trial transcript at pp. 220-223.

specific intent.[27]   Thereafter, the jury foreperson requested that the trial court "read the

definition of specific intent once more."[28]   The trial court complied, rereading the requested

jury instruction after explaining:

> To read to you the definition of specific intent, I have to read the definition of
> criminal intent.  Because criminal intent may be either specific or general.  So
> I have to read the entirety of the definition so you can - -  so the actual term
> "specific intent" will be defined.  This is the only way that I can do this.[29]

Jurors also requested that the court reread the instruction regarding the definition of insanity.

The trial court complied, advising:

> Now, I'm going to read to you, again, the definition of insanity.  To make  - -
> for this to make sense, jurors, I have to read it in its entirety.  If I try to excerpt
> some of it, my fear is that I will not do justice to the definition of it.[30]

Finally, jurors requested that the court once again define the list of responsive verdicts.

Again, the court complied with the jury's request, stating:  "I'm going to define again for you

first degree murder, second degree murder and manslaughter."[31]

      Petitioner complains that she "was denied her right to a fair trial in so far as the

---

[27]*See* State rec., vol. 2 of 3, trial transcript at p. 244.

[28]*See* State rec., vol. 2 of 3, trial transcript at p. 245.

[29]*See* State rec., vol. 2 of 3, trial transcript at p. 246.

[30]*See* State rec., vol. 2 of 3, trial transcript at p. 246.

[31]*See* State rec., vol. 2 of 3, trial transcript at p. 246.

Court failed to reread the entirety of the instructions without a stipulation on the record that only the requested portions should be read."  Petitioner adds:  "[D]efense counsel failed to object to the reading of only a portion of the instructions rather than the instructions as a whole.  For this reason, [she] was denied her right to effective assistance of counsel."[32]

As was the case with several of petitioner's prior arguments, she fails, in connection with the instant argument, to specify how she was prejudiced by the fact that the court did not reread his instructions to the jury in their entirety.  The transcript reflects that the trial court was careful to read the pertinent portions in their entirety, rather than taking them out of context and running the risk of confusing jurors.  Once again, petitioner's argument is without merit.

In addition to their questions regarding the court's instructions, jurors also inquired whether or not petitioner, if she was incarcerated, would "receive any psychological and psychiatric treatment for her mental problems?"[33]  The trial court, before addressing jurors, discussed the matter in chambers with counsel.  Defense counsel took the position that if the court responded in the affirmative, it would give the mistaken impression that if found guilty and incarcerated, petitioner would receive the same mental treatment that she would receive if she was deemed not guilty by reason of insanity.  On the other hand, it was agreed

---

[32] *See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 34-35.

[33] *See* State rec., vol. 2 of 3, trial transcript at p. 247.

that a negative response would be equally misleading since, if incarcerated, petitioner would receive mental health care, though said care would not be as good as the care she would receive at the Feliciana Forensic Facility if deemed not guilty by reason of insanity.[34] Following said discussion, defense counsel opined: "Well, judge, the best way to handle it, I think then, is to read the jury instruction again to them and let them make that determination. Because to answer otherwise prejudices her."[35] The court, to a certain extent, agreed, and, upon returning to the courtroom, the following colloquy ensued:

BY THE COURT:

> The defendant is here with her counsel. And the state is, likewise, represented. I have a question from you, jurors. The question is: if she's incarcerated, will she receive any psychological and psychiatric treatments for her mental problems. That's the question that's before me; is that correct?

BY THE FOREPERSON:

> That's correct.

BY THE COURT:

> Now, jurors, to answer that it's going to take a little explanation, I suppose to you to answer your questions. Jurors, you are here to do two things. The first thing that you must do is to determine whether or not the State of Louisiana has proven beyond a reasonable doubt that Miss Booker committed either first degree murder, second degree murder or manslaughter. Before you do anything else, you have to determine whether or not the State of Louisiana has proven beyond a reasonable doubt that Miss Booker, in fact, committed a first degree murder or a second degree murder or a manslaughter. If you cannot

---

[34]*See* State rec., vol. 2 of 3, trial transcript at pp. 248-253.

[35]*See* State rec., vol. 2 of 3, trial transcript at p. 253.

23

determine unanimously that the State of Louisiana has done that, we never get to the other aspect of this.  That's the first thing you have to do.  Now, if you've done that, then you get to the other aspect of it.  The other aspect of it is [for] you to determine whether or not Miss Booker is not guilty of the offense, because she was insane at the time she committed it.

You have to determine the first aspect first, before you get to the second.  If you arrive at the second; that is, a determination of whether or not Miss Booker is not guilty of the offense because she was insane at the time she committed it, then, jurors, you have to decide that.  You have to decide the answer to that question.  What happens as a result; that is, what happens as a result of either.  I have told you, that if she's found guilty of first degree murder, she will be imprisoned at hard labor either for life in prison, without the benefit of probation, parole, or suspension of sentence, or she will be committed to die as a result.  But that, again, will be your determination.  If she's found guilty of second degree murder, she shall be sentenced to life imprisonment, without the benefit of probation, parole or suspension of sentence.  If she's found guilty of manslaughter, the sentencing as to that is strictly my purview.  And so that's why I don't go into that.  Because that's my purview, jurors.

If she's found not guilty by reason of insanity, I told you what would happen.  I did.  And now, if you like, I will tell you that again.  Those are the things that will happen if she's found not guilty by reason of insanity.  Just a matter of caution, I'll tell you that again.

BY THE FOREPERSON:

Judge.

BY THE COURT:

Yes, sir.

BY THE FOREPERSON:

In addition, would you read also the legal definition if insanity again for the jury?

BY THE COURT:

    I will do so, as soon as I find it.


THE COURT READ THE REQUESTED INSTRUCTION.


BY THE COURT:

    Jurors, do you have any other questions?


BY A JUROR:

    Read one and two.


BY A JUROR:

    First degree and - -


BY THE COURT:

    First degree and second degree murder, the definitions?  Yes, ma'am.


THE COURT READ THE REQUESTED INSTRUCTIONS.


BY THE COURT:

    Do y'all have any other questions?


BY MS. LAGATUTTA (the prosecutor):

    Judge, their question, did you answer their question yet?


BY THE COURT:

    No, I did not.  And, jurors, I've answered it, though, to the extent to which I can.  I've answered your question, to the extent to which I can.[36]

---

[36] *See* State rec., vol. 2 of 3, trial transcript at pp. 253-256.

Petitioner argues that the above instruction was "erroneous, misstates the law, was confusing, and only a partial reading of jury instructions in [the] absence of stipulation for same.  As such, [she] was denied her due process rights to a fair trial."  Petitioner adds: "Defense counsel failed to object to the reading of the instruction, and as such Booker was denied her right to effective assistance of counsel at trial."[37]

Once again, petitioner has failed to demonstrate how she was prejudiced by the court's response to the jury's query.  The court's instruction was neither erroneous nor confusing and it did not represent a misstatement of the law.  Petitioner's claim is without merit.

**D.  Unconstitutional Grand Jury Composition**

Petitioner claims that she is entitled to habeas corpus relief because the grand jury which indicted her was unconstitutionally selected and, as such, the trial court lacked jurisdiction.  The State, in its response, submits that the instant claim "has been procedurally defaulted", and therefore, should be denied.[38]  Based upon the following, this court agrees.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the merits of the federal claim and adequate to support that judgment.  *Amos v. Scott*, 61

---

[37]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 35.

[38]*See* Federal rec., doc. 28, pp. 15-17.

F.3d 333, 338 (5th Cir.), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995),

*citing Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

This "independent and adequate state law" doctrine applies to both substantive and

procedural grounds and affects federal review of claims that are raised on either direct or

habeas review.   *Amos*, 61 F.3d at 338 (citations omitted).   As explained in *Coleman v.*

*Thompson*, 501 U.S. 722, 730-31, 111 S.Ct. 2546, 2554, 115 L.Ed .2d 640 (1991):  "In the

habeas context, the application of the independent and adequate state ground doctrine is

grounded in concerns of comity....  Without the rule, ... habeas would offer state prisoners

whose custody was supported by independent and adequate state grounds ... means to

undermine the State's interest in enforcing its laws."

   In the instant matter, the state district court, addressing petitioner's grand jury

challenge in connection with his post-conviction application, found that petitioner had

waived his challenge due to his failure to raise it in a timely motion to quash prior to trial.

Specifically, the district court held:

> Although courts have granted relief based upon the issue of the validity
> of the former process in which the grand jury forepersons were selected, not
> all requirements have been met.  A motion to quash indictment is a prerequisite
> to challenging the selection of a grand jury foreperson.  *State v. Woodberry*,
> 2002-0994 (La. App. 4 Cir. 6/5/02), 820 So.2d 638, 642.  As this was never
> done, this court has no choice but to deny your application as to this issue.[39]

_____

[39]A copy of the state district court's post-conviction Judgment is attached to petitioner's
supporting memorandum as Exhibit 19.

27

The United States Fifth Circuit Court of Appeal has clearly provided that the above procedural bar "provides an 'adequate and independent' state law ground" for denying a constitutional challenge to the grand jury composition. *Williams v. Cain*, 125 F.3d 269, 276 (5th Cir. 1997). As such, federal habeas review is barred absent a showing of both "cause" for the default and "prejudice attributed thereto", or a demonstration that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Amos*, 61 F.3d at 338-39; *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Harris*, 489 U.S. at 262, 109 S.Ct. at 1043; *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed. 783 (1982).

In the instant matter, petitioner has not demonstrated the requisite cause and prejudice, as such, the instant claim is procedurally barred unless she can show that a fundamental miscarriage of justice would result. In order to establish a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001) (*citations omitted*). Petitioner, in this instance, has made no such showing. Accordingly, the instant claim is subject to dismissal.

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus

28

relief filed on behalf of petitioner, Jeanmarie Booker, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __28th__ day of _____March_____, 2007.

LOUIS MOORE, JR.

United States Magistrate Judge